# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF TEXAS

# WACO DIVISION

|  |  |
|---|---|
| THE ANSCHUTZ CORPORATION and LIGHTEDGE HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> BROWN ROBIN CAPITAL, LLC, SIERRA TWO INTERNET, INC., LUCAS BRAUN, RYAN ROBINSON, JACK D'ANGELO, BOBBY BOUGHTON, and MICHAEL SMERKLO, <br><br> Defendants. | Civ. No. 6:19-cv-183 |

## COMPLAINT

Plaintiffs LightEdge Holdings, LLC ("**LightEdge**") and The Anschutz Corporation ("**Anschutz**" and, together with LightEdge, "**Plaintiffs**"), by and through their undersigned attorneys, allege as follows:

## NATURE OF ACTION

1.      This breach of contract and fraud action arises out of LightEdge's purchase of a cloud computing and data center services business known as

OnRamp Access, LLC ("**OnRamp**" or the "**Company**") from defendants Brown Robin Capital, LLC, Sierra Two Internet, Inc., Lucas Braun, Ryan Robinson, Jack D'Angelo and Michael Smerklo (collectively, the "**Sellers**").  LightEdge is a 96%-owned subsidiary of Anschutz.

2.     LightEdge agreed to pay the Sellers $106 million to acquire OnRamp pursuant to a July 2, 2018 Unit Purchase Agreement (the "**Agreement**"). LightEdge agreed to the transaction and determined the purchase price based on, among other things, the Company's adjusted earnings before interest, taxes, depreciation and amortization ("**EBITDA**"), the Company's pipeline of new business opportunities, and representations and warranties made by the Sellers concerning the truthfulness of that information.  Anschutz provided LightEdge with $62 million in equity capital to help finance the transaction.

3.     Immediately after the closing, LightEdge learned that OnRamp's senior executives, including defendants Lucas Braun (CEO), Ryan Robinson (President), Jack D'Angelo (CFO) and Bobby Boughton (Vice President of Sales) (collectively, together with Brown Robin Capital, LLC, the "**OnRamp Insiders**"), had falsified the Company's books and records in order to artificially inflate the EBITDA and pipeline information that Sellers knew LightEdge was relying on to formulate the purchase price.

4.     The OnRamp Insiders falsified the Company's financial records to prevent LightEdge from walking away from the transaction prior to closing and/or to induce LightEdge to buy the Company for tens of millions of dollars more than it was actually worth.  The motive was simple – all of the OnRamp Insiders other than Boughton were Sellers in the transaction, while Boughton received a substantial bonus, a promotion and salary increase when the deal closed.

5.     Due to the OnRamp Insiders' fraudulent activities, multiple representations and warranties that all of the Sellers made in the Agreement were separately and independently breached at the closing.  The Sellers' breaches and the OnRamp Insiders' fraud took three principal forms.

6.     *First*, the OnRamp Insiders intentionally concealed the fact that one of the Company's largest customers, Yeti Coolers, had repeatedly notified the Company in writing that Yeti was terminating certain services and thus reducing its monthly business with the Company by approximately 50%.  The Sellers, however, falsely represented in the Agreement that Yeti had made only minor reductions in its existing business with the Company, and that Yeti in fact was likely to materially increase its overall purchases from the Company through a new pending business opportunity.

7.     The OnRamp Insiders knew that the Sellers' representations concerning Yeti were knowingly and intentionally false when made.  Shortly after

3

closing, the Yeti service terminations that the OnRamp Insiders had concealed from LightEdge took effect, resulting in a significant loss of recurring revenue for the Company.

8.     *Second*, the OnRamp Insiders instructed the Company's sales representatives to intentionally falsify the sales pipeline information maintained in the Company's Saleforce.com database.  By falsifying the Salesforce.com data, the OnRamp Insiders falsely portrayed the Company as having millions of dollars in near-term business opportunities available from a broad mix of customers.

9.     Critically, the OnRamp Insiders took this step immediately after the Company lost a significant customer account (Spiceworks) and underperformed in generating new sales during April 2018.  LightEdge, which was then engaged in pre-contract due diligence, began asking detailed questions about future business prospects that could replace the lost customer account and support growth.  In response to LightEdge's questions, the OnRamp Insiders instructed Company employees to doctor the Salesforce.com database so that it would show numerous business opportunities that the OnRamp Insiders knew the Company had already lost, transactions that senior Company executives knew had never progressed beyond the introductory meeting stage, and transactions that were mischaracterized in terms of the stage of negotiations.

10.     The OnRamp Insiders presented the false information to LightEdge to create the appearance that the Company had a robust pipeline of new business that would fuel revenue and EBITDA growth.  In reality, the majority of the Company's pipeline was false – as LightEdge immediately discovered when the transaction closed.

11.     _Third_, the Sellers provided LightEdge with financial statements that the OnRamp Insiders had doctored to include revenue and accounts receivable for customer accounts that the OnRamp Insiders knew had been terminated, discontinued, or were uncollectible.

12.     All three components of the OnRamp Insiders' fraud served the same purpose:  to inflate the past, present, and projected future profitability of the Company to induce LightEdge to buy the Company at an inflated purchase price and to induce Anschutz to fund the transaction.  Their fraud achieved its purpose.

13.     The OnRamp Insiders knew when they decided to defraud Plaintiffs that LightEdge would be significantly overpaying for the Company based on revenues, adjusted EBITDA and a robust pipeline the OnRamp Insiders knew did not actually exist.  Given the egregious nature of Sellers' fraud, the OnRamp Insiders should be required to pay not only compensatory damages, but also substantial punitive damages in order to deter similar conduct in the future.

**THE PARTIES**

14.     Plaintiff Anschutz is a Delaware corporation with its headquarters located in Denver, Colorado.

15.     Plaintiff LightEdge is a Delaware limited liability company with its headquarters located in Des Moines, Iowa.  Anschutz owns 96% of the membership interests in LightEdge; the remaining 4% is owned by Twin Eagle Ventures, LLC ("Twin Eagle").  The members of Twin Eagle are citizens and residents of Colorado and Washington.

16.     Defendant Brown Robin Capital, LLC ("**Brown Robin**") is a Seller, with its headquarters located in Austin, Texas.  Upon information and belief, the members of Brown Robin reside in Texas, California, Massachusetts, and New York.

17.     Brown Robin is an investment vehicle managed exclusively by defendants Lucas Braun and Ryan Robinson.  Because they managed Brown Robin and, on information and belief, made all decisions on its behalf, all of Mr. Braun's and Mr. Robinson's actions and knowledge can be imputed to Brown Robin.

18.     At the time of the Agreement, Brown Robin had fifteen investors, including Housatonic Equity Investors IV, LP; Ryan Robinson; Lucas Braun; Marion Equity Partners; The Peter and April Kelly Family Trust, Dated August 9, 2006; Russell J. Ellis; Futaleufu Partners; William F. Duhamel and Katherine B. Duhamel as joint tenants with rights of survivorship; Search Fund Partners 4, LP;

Granite Point Partners Holding (CA-General Partnership); Taweel Family Trust; QMC Partners-D LLC; Oak Drive Capital, LLC; Housatonic Equity Affiliates IV, LP; and Ohana Capital Partners I, LP (collectively, the "**Brown Robin Investors**").

19.     At the time of closing, Brown Robin owned 93.2% of the equity (or units) in OnRamp, and Brown Robin (and the Brown Robin Investors) accordingly received 93.2% of the proceeds of the fraud.

20.     Defendant Sierra Two Internet, Inc. ("**Sierra**") is a Seller and a Texas corporation with its headquarters located in Austin, Texas.   Sierra is, on information and belief, owned, controlled and/or managed by OnRamp founder Chad Kissinger.

21.     Defendant Lucas Braun is a Seller, an OnRamp Insider, and a manager of Brown Robin.  Mr. Braun served as the CEO of OnRamp at the time of the acquisition.  Upon information and belief, Mr. Braun is a citizen of Texas who resides at 2202 Bowman Ave., Austin, TX 78703, which is in this District and within 100 miles of the Waco Division U.S. District Court.

22.     Defendant Ryan Robinson is a Seller, an OnRamp Insider, and a manager of Brown Robin.  Mr. Robinson and Mr. Braun shared a small office at OnRamp's headquarters in Austin, Texas, and were accordingly aware of each other's work activities.  Mr. Robinson served as the Chairman and President of

OnRamp at the time of the acquisition. Upon information and belief, Mr. Robinson is a citizen of Texas who resides at 2524 Pecos St., Austin, TX 78703, which is in this District and within 100 miles from the Waco Division U.S. District Court.

23. Defendant Jack D'Angelo is a Seller and OnRamp Insider and served as the Chief Financial Officer of OnRamp at the time of the acquisition. Upon information and belief, Mr. D'Angelo is a citizen of Texas who resides at 311 Bowie Street, Apt. 1613, Austin, TX 78703, which is in this District and within 100 miles from the Waco Division U.S. District Court.

24. Defendant Mike Smerklo is a Seller and, upon information and belief, a citizen of Texas who resides in this District.

25. Defendant Bobby Boughton, an OnRamp Insider, was formerly the Company's Vice President of Sales and is, on information and belief, a citizen of Texas who resides in this District. Mr. Boughton agreed to participate in the fraud because, when the transaction closed, he received a bonus of $168,578 from the Sellers' proceeds, a promotion from Vice President of Sales at OnRamp to Executive Vice President of Sales at LightEdge, and a substantial increase in salary.[1]

---

[1]  LightEdge reserves its right to amend this Complaint and assert fraud claims against Sierra, Mr. Kissinger, Mr. Smerklo and/or the Brown Robin Investors in the event that discovery shows that any of

## JURISDICTION AND VENUE

26.     This Court has personal jurisdiction over Defendants because the Defendants, on information and belief, are citizens and residents of Texas.[2]

27.     Subject matter jurisdiction is proper in this Court based upon diversity of citizenship under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

28.     Venue is proper in this Court because the Defendants reside in this District.

29.     Venue is proper in the Waco Division of this District because OnRamp serves multiple customers in Bell County, including Emerson Construction and DataMax Consulting Corp., which are both based in Temple, Texas.

## FACTUAL BACKGROUND

30.     OnRamp is an IT, hybrid and cloud computing, managed services, and data center service provider.  It operates multiple enterprise-class data centers to help customers protect highly sensitive data and critical IT infrastructure.   It partners with businesses in industries such as healthcare and financial services to

---

those individuals or entities participated in, aided or abetted, or conspired to commit the OnRamp Insiders' fraud.

[2]      Section 13.8 of the Agreement contains a narrow and incomplete forum selection clause that does not apply to the claims asserted in this action.

guide them through the complexities of data security and achieving industry compliance. OnRamp provides a broad range of hybrid computing and managed services, and provides custom solutions from colocation to cloud that are tailored to its customers' unique requirements.

31.    Early in 2018, the Sellers, who owned all of the equity in OnRamp, began marketing OnRamp for sale via a competitive auction process. Acting by and through Anschutz employees based in Colorado, LightEdge submitted an offer, which it later revised several times, and entered into a letter of intent on May 18, 2018.

32.    Throughout the bidding process, LightEdge (again acting by and through Anschutz employees based in Colorado) communicated with the Sellers' bankers about the valuation methodologies LightEdge was using. Among other things, Sellers' bankers provided Anschutz and LightEdge with a comparable transactions analysis showing that the price paid in 23 similar transactions since 2016 was based on an adjusted EBITDA multiple. The Sellers were therefore aware that Anschutz and LightEdge were basing their valuation on a multiple of the Company's adjusted EBITDA.

33.    The final purchase price of $106 million equated to a multiple of 12x the Company's adjusted EBITDA. Anschutz and LightEdge agreed to pay the 12x

multiple based on the Company's adjusted EBITDA in Q1 2018 and the robust pipeline that the OnRamp Insiders presented.

34.    On July 2, 2018, Anschutz employees located in Colorado directed their bank, the Denver, Colorado office of Wells Fargo, N.A., to wire the funds to Sellers for the purchase of OnRamp.   Wells Fargo processed the wire transfer instruction from their wire room located in Golden, Colorado.

35.    Pursuant to § 13.11 of the Agreement, all communications to LightEdge relating to the transaction must be directed to Scott Carpenter, a senior Anschutz officer, at his office in Denver, Colorado, and to Mark Kurtenbach of Hogan Lovells US LLP, Anschutz's outside counsel, at his office also located in Denver, Colorado.

## FRAUD AND BREACHES CONCERNING YETI

36.    The first category of breach of representation and warranty by the Sellers and fraud by the OnRamp Insiders concerns the Company's relationship with Yeti.  According to Section 2.20(a) of the Disclosure Schedule, Yeti was the Company's fourth largest customer in 2016, with $934,201 in Annual Recurring Revenue ("**ARR**"); the Company's fifth largest customer in 2017, with $1,083,810 in ARR; and the Company's sixth largest customer as of March 31, 2018, with $1,100,280 in ARR.

37.    The Sellers expressly represented in Section 2.20 of the Agreement that "Section 2.20(a) of the Disclosure Schedule sets forth the twenty (20) largest customers (measured by revenue) of the Company during each of calendar years 2017 and 2016 and for the three (3) months ended March 31, 2018," and that "[o]ther than as set forth on Sections 2.20(a) or (b), as applicable, of the Disclosure Schedule, none of the customers listed on Section 2.20(a) of the Disclosure Schedule …. with respect to 2017 and 2018 only, has canceled, terminated, adversely modified or decreased, or, to the Company's Knowledge, threatened in writing to cancel, terminate, adversely modify or decrease, in each case, in any material respect, its commercial relationship with the Company."

38.    Similarly, the Sellers represented in Section 2.10 of the Agreement that "[e]xcept as set forth on Section 2.10 of the Disclosure Schedule, since

12

December 31, 2017, (x) the Company has conducted its business in the ordinary course of business consistent with past practices and (y) the Company has not . . . (l) terminated or amended in any material respect any Material Contract or any contract or agreement that would have been required to be listed on Section 2.11 of the Disclosure Schedule if such contract or agreement were in effect on the date hereof."

39.   Finally, the Sellers represented in Section 2.11 of the Agreement that "Section 2.11 of the Disclosure Schedule contains a correct and complete list of the following contracts, agreements, leases and other legally binding instruments to which the Company is a party to or otherwise bound (whether written or oral)," including (f) "agreements or series of related agreements with customers, suppliers and vendors of the Company for the purchase or sale of goods or services involving annual payments in excess of $75,000 per year," and (r) "each amendment, supplement and modification in respect of any of the foregoing."  The contracts covered by the Sellers' representations in Section 2.11 of the Agreement included contracts with Yeti that the Sellers represented to be "in full force and effect."  The Sellers further represented that "[o]ther than in the ordinary course of business consistent with past practices, the Company is not participating in any discussions or negotiations regarding any material modification of, or any material

amendment to, any Material Contract or entry, into any new material contract applicable to the Company."

40.    The above representations with respect to Yeti were false when made, and with respect to the OnRamp Insiders, knowingly and intentionally false when made.  As many as six months before the signing of the Agreement on July 2, 2018, Yeti notified the Company in writing that Yeti planned to substantially decrease its use of OnRamp services by approximately $42,000 to $48,000 in Monthly Recurring Revenue ("**MRR**").  The OnRamp Insiders knew this fact and intentionally concealed it from LightEdge and Anschutz.

41.    Specifically, on December 6, 2017, Robert Wisian, Jr., Senior Systems Administrator at Yeti, notified the Company by email that Yeti planned to "begin reducing some of our costs in order to leverage the ability to pivot to other projects."  Yeti itemized the products and services that it wanted to eliminate, noting that the "goal here is to see a reduction in cost, not a zero sum change." Yeti concluded that it wanted "dates to action for a timeline on achieving these [reductions in service] in order to reduce our monthly subscriptions" with the Company.

42.    Upon information and belief, the OnRamp Insiders instructed Company employees to stall in response to Yeti's request so that the Company's

financial records would not show a decline in revenue from Yeti prior to the execution of the Agreement.

43.     On January 22, 2018, Jay Adcock, Director of IT Operations at Yeti, left a voice message with OnRamp's Director of Client Relations, Joel Martin, requesting a meeting to discuss the status of the service reduction project.  The following day, OnRamp Insiders Mr. Braun and Mr. Robinson had a conference call with Mr. Martin to discuss Yeti's requested service reductions.  Later in the day, Mr. Adcock informed the Company that Yeti was seeking to reduce services purchased from the Company by at least $42,000 to $48,000 in MRR.  Mr. Martin relayed this information to Mr. Braun and Mr. Robinson that evening.

44.     On January 24, 2018, Mr. Braun sent an email to Mr. Boughton describing the meeting with Yeti as "a bit tragic."  Mr. Boughton responded by informing Mr. Braun that "there is a decom in the works," that a potential new project moving to the Company "would be small," and that a larger potential project involving SAP services "was not even in the kitchen, let alone on the back burner."

45.     On Friday April 17, 2018, Mr. Adcock sent another email to OnRamp sales representatives Frank Arnett, Baktash Taghehchian and Mr. Martin complaining that "[w]e don't seem to be making much progress on the decommissioning project."  He objected that the Company had "somehow

extended our commitments" for services Yeti no longer wanted, stating that Yeti intentionally paid more for limited one-year terms so that it would not be obligated to continue purchasing services it would not need for long periods of time.

46.     The following Monday, April 23, 2018, Mr. Taghehchian sent an email to all four OnRamp Insiders stating "[h]ere is what we are looking at" and enclosing a spreadsheet listing specific Yeti service cancellations totaling over $40,000 in MRR.  That afternoon, Mr. D'Angelo had a telephone conference with Mr. Adcock to further discuss the Yeti service reductions.

47.     On May 24, 2018, Mr. Adcock again emailed OnRamp regarding services Yeti wanted turned off.  Mr. Arnett received Mr. Adcock's email and forwarded it to all four OnRamp Insiders, asking "[l]et me know how you'd like to have these handled guys."

48.     Consistent with its pre-signing notice to and communications with the Company, in September 2018, two months following the close of the acquisition, Yeti reduced its business with the Company by approximately $41,000 in MRR, which was approximately half of the overall Yeti relationship.  Sellers did not disclose these service reductions, but instead identified in the Disclosure Schedules separate and substantially smaller reductions from Yeti that the Sellers stated in the Disclosure Schedules would be offset by other service upgrades.  The Sellers further mislead Anschutz and LightEdge in the Disclosure Schedules by falsely

16

claiming that the Company was "[i]n discussions about a large potential upgrade related to Yeti's migration to a new ERP platform" and by falsely stating that "as part of that there could be additional downgrades along the way, but the upside far outweighs the potential downgrades."

49.     As the above emails and telephone discussions illustrate, the OnRamp Insiders, who were the Company's senior-most executives, knew that Yeti, OnRamp's sixth largest customer, was planning to significantly reduce the services it purchased from OnRamp.

50.     The OnRamp Insiders knowingly and intentionally concealed the full scope of Yeti's planned service reductions from Anschutz and LightEdge, omitting nearly all of the service reductions from the Disclosure Schedules and instructing OnRamp employees, including Mr. Martin, to do everything necessary to delay implementing the terminations Yeti had requested in writing until after the closing. In addition to the misrepresentation in Section 2.11(r) of the Disclosure Schedules, the OnRamp Insiders also modified the Company's pipeline database, as described more fully below, to state that OnRamp had quoted Yeti for nearly $2 million a year in new business for SAP services – an advanced stage in the Company's negotiating process for new business.

51.     In fact, the possibility of a large new Yeti transaction involving SAP hosting services had already been rejected by Yeti months earlier.  OnRamp had

not undertaken any of the extensive scoping and engineering steps that would have been needed for OnRamp to quote Yeti for SAP hosting services.  Yet Mr. Braun and Mr. Boughton asserted that OnRamp had an active business opportunity to sell SAP hosting services in written documents and at a meeting with LightEdge on June 6, 2018, despite knowing that Yeti had already rejected that business opportunity and that, as the Company's employees put it, a potential deal to sell Yeti SAP hosting services "was not even in the kitchen, let alone on the back burner."

52.     Defendants' failure to disclose Yeti's stated intention to reduce its purchases from the Company constitutes fraud, intentional misrepresentation, and a breach of the Sellers' representations and warranties contained in Sections 2.10, 2.11 and 2.20 of the Agreement.

53.     Plaintiffs reasonably and justifiably relied on the Sellers' false representations concerning Yeti when LightEdge agreed to purchase the Company for the inflated $106 million purchase price and when Anschutz funded the transaction.

## FRAUDULENT MANIPULATION OF COMPANY PIPELINE DATA

54.     The OnRamp Insiders' deliberate falsification of the Company's financial picture was not limited to misrepresenting the Company's relationship with Yeti.   The OnRamp Insiders also actively instructed the Company's

employees to falsify the pipeline of new business opportunities they were providing to LightEdge to overstate the Company's near-term business prospects and to falsely reassure LightEdge that the revenue lost when Spiceworks cancelled its subscription for services would be replaced by new business.

55.     On numerous occasions throughout the auction process, the Sellers provided Anschutz and LightEdge with information depicting a robust pipeline of new business that would expand the Company's revenue.  Anschutz and LightEdge relied on that information in deciding to proceed with the transaction, valuing the Company, and determining the EBITDA multiple that LightEdge was willing to pay.

56.     As negotiations progressed, on May 4, 2018 the Sellers disclosed to Anschutz and LightEdge that a significant customer, Spiceworks, had cancelled its subscription for services from the Company, reducing the Company's annualized recurring revenue by approximately $600,000.  Shortly thereafter, the Company provided Anschutz and LightEdge with its April sales data, which showed that the Company had generated only $12,000 in new MRR, which was approximately $30,000 below the Company's April target of $42,000 in new MRR.

57.     The Spiceworks cancellation and April sales underperformance put the deal at risk.  Anschutz and LightEdge considered cancelling or substantially revising the terms of the pending offer.   In response to the Spiceworks

cancellation, Anschutz and LightEdge requested additional information about the pipeline of new business opportunities that could potentially replace the lost Spiceworks revenue and support EBITDA and revenue growth.

58.    After the Company lost the Spiceworks account, Anschutz and LightEdge made clear to the Sellers' bankers that Anschutz and LightEdge were relying on the existence of a robust pipeline of new business opportunities to support the agreed upon purchase price of $106 million.  On or about May 19, 2018, Anschutz and LightEdge asked the OnRamp Insiders for the Company's latest Salesforce.com pipeline data, and set a telephone conference for the week of May 21 to discuss that data.

59.    Immediately after receiving this request, the OnRamp Insiders launched a campaign to alter the Company's books and records regarding pipeline and business opportunities maintained on Salesforce.com.  The OnRamp Insiders' fraud was egregious:  they took a pipeline with minimal business development opportunities and amended it to include more than $6 million in additional new annual business opportunities that they knew had no chance of being realized, including making specific statements about those opportunities (such as stating that the Company had quoted a prospective customer for new business) that the OnRamp Insiders knew were false.

60.     For example, at the time Anschutz and LightEdge requested updated pipeline information, the Company's Salesforce.com database did not list any active pipeline opportunity to sell Yeti any SAP hosting services.  Frank Arnett, the salesperson that had dealt with Yeti, had originally input information on the potential Yeti opportunity into the Salesforce.com system, but once it became clear that Yeti would not be purchasing SAP hosting services from the Company, he listed the "stage" of the potential deal as "0-Closed Lost."

61.     At 7:24PM on Sunday, May 20, 2018, just days after Anschutz and LightEdge requested updated pipeline information from the Sellers, Mr. Braun personally logged into Salesforce.com and changed the "stage" associated with the previously entered potential SAP hosting deal with Yeti from "0-Closed Lost" to "quoted."  Mr. Braun made this change even though he knew the Company had never provided a quote to Yeti for the SAP migration.

62.     That same evening, Mr. D'Angelo sent Mr. Braun an email with no title or content, attaching the Company's then-current sales pipeline data.

63.     The following morning, Monday, May 21, 2018, Mr. Braun instructed Mr. Boughton, the Company's Vice President of Sales, to further falsify the Company's Salesforce.com records.  After the Company's regularly scheduled weekly sales meeting, held at the Company's Austin, Texas headquarters, Mr. Braun sent an email to Mr. Boughton with three attachments containing additional

fraudulent information on potential new business, and instructed Mr. Boughton to have the Company's Salesforce.com records modified to reflect this information. Mr. Boughton executed Mr. Braun's instruction, emailed fraudulent spreadsheets to Company sales team members, and instructed the sales team members to revise the Company's Salesforce.com pipeline information to conform to the spreadsheets.

64.   Messrs. Boughton and Braun were fully aware that they were asking the sales team to falsify the Company's pipeline records, and took these actions for the purpose of creating false records that could be provided to Anschutz and LightEdge to misrepresent the Company's pipeline of new opportunities as robust.

65.   Mr. Robinson, the Company's President, and Mr. D'Angelo, the Company's CFO, exchanged multiple emails with Mr. Braun and Mr. Boughton regarding LightEdge and Anschutz' requests for pipeline data, and were thus fully aware that LightEdge and Anschutz were relying on the Company's pipeline data. They were also aware of, participated in, and approved of Mr. Braun and Mr. Boughton's efforts to falsify that data.

66.   For example, Mr. Boughton instructed the Company's sales team to add a new business opportunity to the Salesforce.com database that stated that the Company had quoted the American Automobile Association ("**AAA**") for $305,000 in new MRR, which would have amounted to over $3.6 million in new

annual recurring revenue – by far the Company's largest deal.   Being in the "quoted" stage signifies that the counterparties have had advanced discussions around the scope of work and pricing of a potential sales transaction.   That information was simply false.   The Company had only attended a single prospecting meeting with AAA months earlier, but had never scoped or designed any potential services for AAA, let alone quoted AAA for any such services. Messrs. Robinson, D'Angelo and Braun received regular email updates on the Company's pipeline of new business opportunities, even when those opportunities involved small amounts, and knew full well that the Company had never quoted AAA for $305,000 in new MRR.

67.    Mr. Boughton's spreadsheets contained numerous other falsifications. They stated that the Company had quoted Yeti for $2 million in new annual recurring revenue for SAP services – which, like the fraudulent AAA opportunity would have been larger than any deal the Company had with any of its other customers – when in fact, the OnRamp Insiders knew that the company had not quoted Yeti for the services the Company was listing on its pipeline.

68.    Mr. Boughton's spreadsheets similarly stated that a company named Forcepoint, LLC had requested a contract with $24,000 in MRR, and listed the "probability" of the contract being awarded as 75%.   In fact, the OnRamp Insiders were well aware that the Company had lost the opportunity to provide the

requested services to Forcepoint the previous year, when the Company's main contact at Forcepoint left.

69.     Mr. Boughton's spreadsheets also stated that the Company was in the "post-quote" stage of landing a $9,000 a month new contract with another customer named Kaleidacare, even though this opportunity had also been lost months earlier.

70.     After Mr. Boughton emailed these spreadsheets to the Company's sales team, members of the Company's sales team, including Mr. Arnett and Keith Miersma, objected, stating that Mr. Boughton's spreadsheets were inaccurate and did not truthfully reflect the status of the Company's potential customer transactions.  Mr. Boughton ignored these objections and instructed the sales team to make their pipelines look exactly like the summaries he emailed to them, including details such as the percentage used to describe the likelihood of deals closing.

71.     As a result of these fraudulent actions, the final Salesforce.com pipeline the Sellers provided to Anschutz and LightEdge included numerous transactions that the Company had lost in 2017; transactions that the Company's CEO Mr. Braun, CFO Mr. D'Angelo, President Mr. Robinson, and Vice President of Sales Mr. Boughton knew had never progressed beyond the introductory

meeting stage; and transactions that were mischaracterized in terms of the stage of negotiations or the likely closing date.

72.     Other transactions improperly or inaccurately included in the Salesforce.com pipeline included: Henry Schein Inc.; HD Vest Financial Services; Alphanumeric; Facilities Solution Group; Demand Gen/Smart Group; National Varco; Healthfirst Bluegrass; and David Weekly Homes.

73.     The Sellers represented in Section 2.10 of the Agreement that "[e]xcept as set forth on Section 2.10 of the Disclosure Schedule, since December 31, 2017, (x) the Company has conducted its business in the ordinary course of business consistent with past practices."   The Sellers similarly represented in Section 2.06 that "[t]he books and records of the Company have been maintained in accordance with good business practices, reflect only valid transactions and are complete and correct in all material respects."

74.     Contrary to the representations and warranties in Sections 2.06 and 2.10 of the Agreement, the Salesforce.com pipeline was not prepared in the ordinary course consistent with past practices or in accordance with good business practices, and it did not reflect only valid transactions.

75.     After delivering the fraudulent Salesforce.com records, Mr. Braun and Jim Masterson, CEO of LightEdge, had a conference call on or about May 23, 2018 to discuss specific aspects of the Company's pipeline.   Mr. Braun

subsequently met with LightEdge on June 6, 2018 for additional discussions that covered the topic.  Mr. Braun stated that the Company had strong prospects for generating new business from the customers listed in the pipeline.  At no time did Mr. Braun or Mr. Boughton reveal that the majority of the opportunities listed in the pipeline were fabricated or were opportunities the prospective customers had already rejected.

76.    Anschutz and LightEdge reasonably and justifiably relied on the Sellers' representations in the Agreement and the Salesforce.com data provided by Messrs. Braun and Boughton.  Due to the OnRamp Insiders' falsification of the Company's records, Anschutz and LightEdge proceeded with the transaction and significantly overpaid for the Company.  In total, the OnRamp Insiders included over half a million dollars in projected MRR in the pipeline that was illusory, with full knowledge that if Anschutz and LightEdge had received accurate information about the absence of any viable business pipeline, they would have rejected the deal or substantially reduced the purchase price.

## FALSIFICATION OF REVENUE AND ACCOUNTS RECEIVABLE INFORMATION

77.    The Sellers represented in Section 2.06 of the Agreement that "true and complete copies of the balance sheets, statements of income, statements of members' equity, and statements of cash flows of the Company as of and for the

years ended 2016 and 2017, as audited by the Company's accountants (the "Audited Financial Statements"), have been provided to Buyer;" that "[t]rue and complete copies of the unaudited balance sheet and statements of income, members' equity, and cash flows of the Company as of and for the three month period ended on March 31, 2018 (such financial statements, the "Interim Financial Statements") have been provided to Buyer."  Further, the Sellers represented that "[t]he Audited Financial Statements and the Interim Financial Statements have been prepared from, and are in accordance with, the books and records of the Company" and that "[t]he Audited Financial Statements and the Interim Financial Statements present fairly and accurately, in all material respects, the financial position of the Company as of the dates thereof and the results of operations and cash flows of the Company for the periods covered by such statements, in accordance with GAAP consistently applied through the periods…."  Finally, the Sellers represented that "[t]he books and records of the Company have been maintained in accordance with good business practices, reflect only valid transactions and are complete and correct in all material respects."

78.    In fact, the Company's Interim Financial Statements included revenue and accounts receivable for customer accounts that the OnRamp Insiders knew had been terminated, discontinued, or were uncollectible.   Mr. D'Angelo, the Company's former Chief Financial Officer, oversaw and was fully aware of this

fraudulent conduct.  Messrs. Braun and Boughton were also personally involved in communicating with customers whose accounts were delinquent and/or with Company sales team members working with those customers, and were aware that these accounts were being misrepresented in the Company's books and records. These customer accounts included, among others, Rosincloud; DataLogic Software, Inc.; Keona Health, Inc.; Response Wise/Digital Street, Inc.; XOR Data Exchange LLC; Genesis Medical Management; Pure Healthy Back, Inc.; Flux Tech LLC; Cloud Cooper; and Nannies from the Heart.

79.    For instance, the Company's Interim Financial Statements included revenues and accounts receivable from Pure Healthy Back, Inc., even though the Company had disconnected all services to Pure Healthy Back, Inc. on or about January 22, 2018 and accordingly would not be receiving any revenue from this customer for disconnected services.   Another customer, Keona Health, Inc., notified the Company in writing on December 28, 2017 that it was cancelling its subscription "effective immediately," yet the Company continued to record revenues and book accounts receivable for this customer as if it were still purchasing services.

80.    The OnRamp Insiders all knew that accounts were being misrepresented on the Company's books and records, and concealed that information from Anschutz and LightEdge.  For instance, on April 12, 2018, the

CFO, Mr. D'Angelo, wrote to Mr. Martin, OnRamp's Director of Client Relations, about the status of XOR Data Exchange LLC, which had told the Company it was shutting down and could not pay the Company's invoices.   Mr. D'Angelo personally rejected an offer to settle the customer's balance and stated that he "will have our collections agency go after them before we will settle" for the sum offered.   OnRamp's financials, however, continued to treat XOR as an account receivable.

81.   Similarly, on April 23, 2018, Mr. Martin emailed Messrs. Braun, D'Angelo and Boughton to discuss another delinquent account, Rosincloud, saying the customer "owes around $51k" but had only paid "$1,000 since his September bill," and that the customer had not responded to three of Mr. Martin's emails.  The Company nonetheless continued to treat Rosincloud as an account receivable on the financial statements it provided to LightEdge.  Mr. Martin also discussed the Rosincloud account with Mr. Robinson, who told him not to worry about it and that the account would be dealt with after the closing.

82.   The OnRamp Insiders' inclusion of false revenue and accounts receivable information in the Company's Interim Financial Statements was intentional and done in order to falsely inflate the Company's adjusted EBITDA in order to induce Anschutz and LightEdge to overpay for the Company.  Anschutz and LightEdge reasonably and justifiably relied on the false information contained

in the Company's Interim Financial Statements and other falsified financial information when negotiating the Unit Purchase Agreement and determining and agreeing to the purchase price.  The effect of the falsified records was to materially overstate the Company's revenue and, as a result, its EBITDA.

<b><u>COUNT I</u></b><br><b><u>BREACH OF CONTRACT</u></b><br>(By Plaintiff LightEdge Against the Sellers)

83.    Plaintiff LightEdge hereby incorporates the allegations in paragraphs 1 through 82 of the Complaint as if they were fully set forth herein.

84.    This cause of action is asserted only by Plaintiff LightEdge and only against the Sellers.  For purposes of this cause of action only, LightEdge does not rely on any of the above fraud allegations and asserts only that the Sellers' representations in the Agreement were false at closing.

85.    As set forth above, the Sellers made numerous representations and warranties to LightEdge concerning the Company's finances, books and records, and the information the Sellers provided to LightEdge, including but not limited to Sections 2.06, 2.10, 2.11, and 2.20 of the Agreement.

86.    The Sellers' representations and warranties as described above were false and therefore breached at the time of closing.

87.    LightEdge was damaged by the Sellers' breaches of its representations and warranties.

88.    The Sellers also promised in Section 7.6 of the Agreement to indemnify and hold harmless LightEdge for breaches of the Sellers' representations and warranties.

89.    The Sellers failed to indemnify LightEdge as agreed.

90.    LightEdge has been damaged by these breaches in an amount to be determined at trial.

## COUNT II
## FRAUDULENT AND INTENTIONAL BREACH OF CONTRACT
(By Plaintiff LightEdge Against the OnRamp Insiders (Other Than Boughton))

91.    Plaintiff LightEdge hereby incorporates the allegations in paragraphs 1 through 90 of the Complaint as if they were fully set forth herein.

92.    As set forth above, the OnRamp Insiders (other than Boughton) made numerous representations and warranties to LightEdge concerning the Company's finances, books and records, and the information the Sellers provided to LightEdge, including but not limited to Sections 2.06, 2.10, 2.11, and 2.20 of the Agreement.

93.    The OnRamp Insiders (other than Boughton) made these misrepresentations to LightEdge with either knowledge or belief or with reckless indifference to their falsity.

94.     The misrepresentations were made with the intent to induce LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers.

95.     LightEdge was damaged in an amount to be determined at trial.

## COUNT III
## FRAUD
(By All Plaintiffs Against the OnRamp Insiders)

96.     Plaintiffs hereby incorporate the allegations in paragraphs 1 through 95 of the Complaint as if they were fully set forth herein.

97.     As set forth above, the OnRamp Insiders made numerous false representations of fact concerning the Company's finances and books and records.

98.     The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge with either actual knowledge of their falsity or with reckless indifference.   The OnRamp Insiders were the senior-most executives at the Company – the President, the CEO, the CFO and the Vice President of Sales.  By virtue of their positions of authority and control, the OnRamp Insiders had complete and unfettered access to all Company information and therefore knew or were reckless in not knowing that the Sellers' representations in the Agreement were false when made.  Further, the transaction with LightEdge was the most important event in the history of the Company, and the OnRamp Insiders all received substantial profits when the transaction closed.  Given the significance of

the transaction to OnRamp and to the OnRamp Insiders personally, the OnRamp Insiders knew or were reckless in not knowing that the Sellers' representations in the Agreement were false when made.

99.     The OnRamp Insiders' misrepresentations were made with the intent to induce Anschutz and LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers, and so that Mr. Boughton would receive a substantial bonus, a promotion, and an increase in salary.

100.   Anschutz and LightEdge reasonably and justifiably relied on the information the OnRamp Insiders provided and misrepresentations the OnRamp Insiders made when it purchased the Company at an inflated price not supported by the Company's actual EBITDA and actual pipeline for future business opportunities.

101.   As a result of this reliance, Anschutz and LightEdge overpaid for the Company in an amount to be determined at trial.

## COUNT IV
## CONSPIRACY TO COMMIT FRAUD
(By All Plaintiffs Against the OnRamp Insiders)

102.   Plaintiff hereby incorporates the allegations in paragraphs 1 through 101 of the Complaint as if they were fully set forth herein.

103.   The OnRamp Insiders agreed to and did in fact work together to defraud Anschutz and LightEdge into closing the transaction and overpaying for the Company.

104.   The OnRamp Insiders committed the overt acts described above in furtherance of their conspiracy.

105.   As a result of the conspiracy, Anschutz and LightEdge were damaged when LightEdge closed the transaction and Plaintiffs overpaid for the Company by an amount to be determined at trial.

## COUNT V
## AIDING AND ABETTING FRAUD
(By All Plaintiffs Against the OnRamp Insiders)

106.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 105 of the Complaint as if they were fully set forth herein.

107.   As set forth above, the OnRamp Insiders aided and abetted one another and the Sellers in making numerous false representations of fact concerning the Company's finances and books and records, including the falsified

records described above, and giving representations and warranties concerning the Company and its finances that the OnRamp Insiders knew were false when made.

108.   The OnRamp Insiders engaged in this conduct with either knowledge or belief or with reckless indifference to the falsity of the representations being made to Anschutz and LightEdge.

109.   The OnRamp Insiders' conduct was intended to, and did in fact, induce (a) LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers and Boughton, and (b) Anschutz to fund the transaction. Each of the OnRamp Insiders provided substantial assistance in furtherance of the OnRamp Insiders' scheme to defraud Anschutz and LightEdge, including by falsifying, or instructing Company employees to falsify, the Company's books and records, and presenting false information about the Company's pipeline to Anschutz and LightEdge.

110.   Anschutz and LightEdge reasonably and justifiably relied on the information the OnRamp Insiders had provided and misrepresentations the OnRamp Insiders made when LightEdge purchased the Company at an inflated price not supported by the Company's actual EBITDA and actual pipeline for future business opportunities, and when Anschutz funded the transaction.

111.   As a result of this reliance, Anschutz and LightEdge overpaid for the Company by an amount to be determined at trial.

35

## COUNT VI
## FRAUDULENT INDUCEMENT
(By All Plaintiffs Against the OnRamp Insiders)

112.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 111 of the Complaint as if they were fully set forth herein.

113.   As set forth above, the OnRamp Insiders made numerous false representations of fact concerning the Company's finances and books and records, including the falsified records described above, and gave representations and warranties concerning the Company and its finances that the OnRamp Insiders knew were false when made.

114.   The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge with either knowledge or belief or with reckless indifference to their falsity.

115.   The OnRamp Insiders' misrepresentations were made with the intent to induce (a) LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers and Boughton, and (b) Anschutz to fund the transaction.

116.   Anschutz and LightEdge reasonably and justifiably relied on the information the OnRamp Insiders had provided and the misrepresentations the OnRamp Insiders made when LightEdge purchased the Company at an inflated price not supported by the Company's actual EBITDA and actual pipeline for future business opportunities.

36

## COUNT VII
## CONSTRUCTIVE FRAUD
(By All Plaintiffs Against the OnRamp Insiders)

117.  Plaintiffs hereby incorporate the allegations in paragraphs 1 through 116 of the Complaint as if they were fully set forth herein.

118.  As set forth above, the OnRamp Insiders made numerous false representations of fact concerning the Company's finances and books and records, including the falsified records described above, and gave representations and warranties concerning the Company and its finances that the OnRamp Insiders knew were false when made.

119.  The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge with either knowledge or belief or with reckless indifference to their falsity.

120.  The OnRamp Insiders' misrepresentations were made with the intent to induce (a) LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers and Boughton, and (b) Anschutz to fund the transaction.

121.  Anschutz and LightEdge reasonably and justifiably relied on the information the OnRamp Insiders had provided and misrepresentations the OnRamp Insiders made when LightEdge purchased the Company at an inflated price not supported by the Company's actual EBITDA and actual pipeline for future business opportunities.

122.   As a result of this reliance, Anschutz and LightEdge overpaid for the Company by an amount to be determined at trial.

**COUNT VIII**
**UNJUST ENRICHMENT**
(By All Plaintiffs Against All Defendants)

123.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 122 of the Complaint as if they were fully set forth herein.

124.   As set forth above, Sellers and Boughton made numerous false representations of fact concerning the Company's finances and books and records, including the falsified records described above.

125.   The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge with either knowledge or belief or with reckless indifference to their falsity, with the intent to induce (a) LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers and Boughton, and (b) Anschutz to fund the transaction.

126.   Anschutz and LightEdge reasonably and justifiably relied on the information the Sellers and Boughton had provided and the misrepresentations the Sellers and Boughton made when LightEdge purchased the Company for $106 million.

127.   Defendants were each unjustly enriched by receiving proceeds of the sale, directly or indirectly, that LightEdge was induced to enter and Anschutz was

38

induced to fund through fraud and misconduct. Sellers received $106 million they would not have received but for their misconduct, and Boughton received additional compensation and other benefits.

## COUNT IX
## CONVERSION
(By All Plaintiffs Against the OnRamp Insiders)

128.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 127 of the Complaint as if they were fully set forth herein.

129.   As set forth above, the OnRamp Insiders made numerous false representations of fact concerning the Company's finances and books and records, including the falsified records described above and giving representations and warranties concerning the Company and its finances that the OnRamp Insiders knew were false when made.

130.   The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge with either knowledge or belief or with reckless indifference to their falsity.

131.   The OnRamp Insiders' misrepresentations were made with the intent to convert Anschutz's and LightEdge's funds by inducing (a) LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers, and (b) Anschutz to fund the transaction.

132.   Through their conduct, the OnRamp Insiders converted $106 million of Anschutz's and LightEdge's funds.   The OnRamp Insiders have no right to retain these converted funds.

## COUNT X
## VIOLATION OF COLORADO CIVIL THEFT LAW
(By Plaintiff Anschutz Against the OnRamp Insiders)

133.   Plaintiff Anschutz hereby incorporates the allegations in paragraphs 1 through 132 of the Complaint as if they were fully set forth herein.

134.   Anschutz personnel negotiated the purchase price and other terms of the OnRamp transaction from their offices located in Colorado.

135.   The OnRamp Insiders sent the false and misleading statements described above to Anschutz personnel at their offices located in Colorado to induce Anschutz to fund the OnRamp transaction.

136.   The OnRamp Insiders knew that their statements and representations to Anschutz were false and misleading when made.

137.   Relying on the false representations made by the OnRamp Insiders, Anschutz personnel approved the transaction and initiated a $62 million wire transfer from the Anschutz office in Colorado to help LightEdge fund the purchase price.   The wire transfer order was received and processed by the Denver, Colorado office of Wells Fargo, N.A.

138.   As a result, the OnRamp Insiders knowingly obtained additional purchase price monies from Anschutz to which they were not legitimately entitled through means of deception in the form of the numerous false representations of fact described above.

139.   The OnRamp Insiders intended to permanently deprive Anschutz of the use and enjoyment of the additional purchase price monies through this deception.

140.   The OnRamp Insiders' actions constitute theft under Colorado law as set forth in Colo. Rev. Stat. § 18-4-401.

141.   As a result of this theft, Anschutz has been damaged in an amount to be determined at trial.

142.   Pursuant to Colorado law, Colo. Rev. Stat. § 18-4-405, Anschutz is entitled to be awarded three times its actual damages, plus costs and reasonable attorneys' fees.

## COUNT XI
## VIOLATION OF THE COLORADO SECURITIES ACT
(By All Plaintiffs Against the OnRamp Insiders)

143.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 142 of the Complaint as if they were fully set forth herein.

144.   As set forth above, the OnRamp Insiders made numerous false representations of fact concerning the Company's finances and books and records,

including the falsified records described above and giving representations and warranties concerning the Company and its finances that the OnRamp Insiders knew were false when made.

145.   As set forth above, the OnRamp Insiders employed a device, scheme, or artifice to defraud Plaintiffs, and engaged in acts, practices, or courses of business which operated as a fraud or deceit upon Plaintiffs.

146.   The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge in connection with their offer of Company securities for sale to LightEdge, with either knowledge or belief or with reckless indifference to their falsity.

147.   The OnRamp Insiders' misrepresentations were made with the intent to induce (a) LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers, and (b) Anschutz to fund the transaction.

148.   Anschutz and LightEdge reasonably and justifiably relied on the information the OnRamp Insiders provided and the misrepresentations the OnRamp Insiders made when LightEdge purchased the Company at an inflated price not supported by the Company's actual EBITDA and actual pipeline for future business opportunities.

149.   The OnRamp Insiders' conduct violates Colo. Rev. Stat. § 11-51-501.

150.   Anschutz and LightEdge are entitled to damages, interest, costs and attorneys' fees under Colo. Rev. Stat. § 11-51-604 in an amount to be proven at trial.

### COUNT XII
### VIOLATION OF THE TEXAS SECURITIES ACT
(By All Plaintiffs Against the OnRamp Insiders)

151.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 150 of the Complaint as if they were fully set forth herein.

152.   This cause of action is pled in the alternative in the event the Court concludes that Texas law applies to the tort claims asserted in this complaint.

153.   As set forth above, the OnRamp Insiders made numerous false representations of fact concerning the Company's finances and books and records, including the falsified records described above and giving representations and warranties concerning the Company and its finances that the OnRamp Insiders knew were false when made.

154.   The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge in connection with their offer of Company units for sale to LightEdge, with either knowledge or belief or with reckless indifference to their falsity.

155.   The OnRamp Insiders' misrepresentations were made with the intent to induce (a) LightEdge to buy the Company at an inflated price and on terms favorable to the Sellers, and (b) Anschutz to fund the transaction.

156.   Anschutz and LightEdge reasonably and justifiably relied on the information the OnRamp Insiders provided and misrepresentations the OnRamp Insiders made when LightEdge purchased the Company at an inflated price not supported by the Company's actual EBITDA and actual pipeline for future business opportunities.

157.   The OnRamp Insiders' conduct violates Tex. Rev. Civ. Stat., art. 581-33(A)(2).

158.   Anschutz and LightEdge are entitled to damages, interest, costs and attorneys' fees under Tex. Rev. Civ. Stat., art. 581-33(D), in an amount to be proven at trial.

## COUNT XIII
## STATUTORY FRAUD UNDER TEX. BUS. & COM. CODE SECTION 27.01
### (By All Plaintiffs Against the Onramp Insiders)

159.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 158 of the Complaint as if they were fully set forth herein.

160.   This cause of action is pled in the alternative in the event the Court concludes that Texas law applies to the tort claims asserted in this complaint.

161.   As set forth above, the OnRamp Insiders made numerous false representations of fact concerning the Company's finances and books and records, including the falsified records described above and giving representations and

warranties concerning the Company and its finances that the OnRamp Insiders knew were false when made.

162.   The OnRamp Insiders made these misrepresentations to Anschutz and LightEdge in connection with their offer of Company units for sale to LightEdge, with actual awareness of, or at the very least, with either knowledge or belief or with reckless indifference to, their falsity.

163.   This offer of Company units is a transaction involving stock in a corporation as contemplated in Tex. Bus. & Com. Code § 27.01.

164.   The OnRamp Insiders' misrepresentations were made for the purpose of inducing Anschutz and LightEdge to enter into a contract to buy the Company at an inflated price and on terms favorable to the Sellers.

165.   Anschutz and LightEdge reasonably and justifiably relied on the information the OnRamp Insiders provided and the misrepresentations the OnRamp Insiders made when LightEdge entered into the contract to purchase the Company at an inflated price not supported by the Company's actual EBITDA and actual pipeline for future business opportunities.

166.   The OnRamp Insiders' conduct violates Tex. Bus. and Com. Code § 27.01.

167. Anschutz and LightEdge are entitled to actual and exemplary damages, interest, costs and attorneys' fees under Tex. Bus. and Com. Code § 27.01 in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in its favor and award it relief including, but not limited to, the following:

A.  An award of compensatory, statutory, exemplary, treble and/or punitive damages, and attorneys' fees in an amount to be proven at trial for all losses and injuries incurred by Anschutz and LightEdge caused by Defendants' breach of contract and fraud;

B.  In the alternative, an order rescinding the Agreement and ordering Sellers to return the $106 million LightEdge was fraudulently induced to pay for the Company based on Defendants' fraudulent conduct; and

C.  Such other and further relief as the Court deems just and proper.

Dated:  March 1, 2019

OF COUNSEL:                          NIX PATTERSON, LLP

HOGAN LOVELLS US LLP                 By:    /derek gilliland/
William M. Regan                     Derek Gilliland
David R. Michaeli                    222 N. Fredonia St.
875 Third Avenue                     Longview, Texas 75606
New York, NY  10022                  (903) 215-8310
Telephone:  (212) 918-3000
                                     Michael Angelovich
KELLOGG HANSEN TODD                  3600 N Capital of Texas Highway
FIGEL & FREDERICK PLLC               Suite B350
Mark C. Hansen                       Austin, Texas 78746
John Thorne                          (512) 328-5333
Sumner Square
1615 M Street, N.W.                  *Attorneys for Plaintiffs The Anschutz*
Suite 400                            *Corporation and LightEdge Holdings, LLC*
Washington, D.C. 20036
(202) 326-7900